## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

MICHAEL K. DORKOSKI,   :
           :
    Plaintiff    :  No. 3:14-CV-1198
           :
  vs.       :  (Judge Nealon)
           :
CAROLYN W. COLVIN, Acting :
Comissioner of Social Security, :
           :
    Defendant  :

## MEMORANDUM

On June 20, 2014, Plaintiff, Michael Dorkoski, filed this instant appeal[1]

under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the

Social Security Administration ("SSA") denying his application for disability

insurance benefits ("DIB") and supplemental security income ("SSI")[2]  under

Titles II and XVI of the Social Security Act,42 U.S.C. § 1461 et seq. and 42

U.S.C. § 1381 et seq., respectively.  (Doc. 1).  The parties have fully briefed the

appeal.  For the reasons set forth below, the decision of the Commissioner denying

Plaintiff's applications for DIB and SSI will be affirmed.

_____

1.  Under the Local Rules of Court "[a] civil action brought to review a decision of
the Social Security Administration denying a claim for social security disability
benefits" is "adjudicated as an appeal."  M.D. Pa. Local Rule 83.40.1.

2.  Supplemental security income is a needs-based program, and eligibility is not
limited based on an applicant's date last insured.

**BACKGROUND**

Plaintiff protectively filed[3] his applications for DIB and SSI on October 27, 2010 alleging disability beginning on December 16, 2008.  (Tr. 15).[4]  The claim was initially denied by the Bureau of Disability Determination ("BDD")[5] on April 1, 2011.  (Tr. 15).  On May 4, 2011, Plaintiff filed a written request for a hearing before an administrative law judge.  (Tr. 15).  A hearing was held on April 2, 2012 before administrative law judge Therese A. Hardiman ("ALJ"), at which Plaintiff an impartial vocational expert, Michele C. Giorgio ("VE"), and Plaintiff's mother, Alice Dorkoski, testified.  (Tr. 15).  On June 15, 2012, the ALJ issued a decision denying Plaintiff's claims because, as will be explained in more detail infra, Plaintiff could perform light work with limitations.  (Tr. 22).

On February 4, 2014, Plaintiff filed a request for review with the Appeals Council.  (Tr. 7).  On April 29, 2014, the Appeals Council concluded that there

---

3. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

4. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on April 3, 2013.  (Doc. 10).

5. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

was no basis upon which to grant Plaintiff's request for review.  (Tr. 1-3).  Thus,

the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on June 20, 2014.  (Doc. 1).  On October

7, 2014, Defendant filed an answer and transcript from the SSA proceedings.

(Docs. 9 and 10).  Plaintiff filed a brief in support of his complaint on November

21, 2014.  (Doc. 11).  Defendant filed a brief in opposition on January 26, 2015.

(Doc. 16).  Plaintiff did not file a reply brief.

Plaintiff was born in the United States on February 21, 1963, and at all

times relevant to this matter was considered a "younger individual."[6]   (Tr. 224).

Plaintiff obtained college and masters degrees, and can communicate in English.

(Tr. 238-239).  His employment records indicate that he previously worked as a

stockbroker, manufacturing engineer, business consultant, and a security guard.

(Tr. 227).  The records of the SSA reveal that Plaintiff had earnings in the years

1979 through 1981, 1987 through 1989, 1991 through 2006, and 2009.  (Tr. 176).

His annual earnings range from a low of no earnings from 1982 through 1986, and

---

6. The Social Security regulations state that "[t]he term younger individual is used
to denote an individual 18 through 49."  20 C.F.R., Part 404, Subpart P, Appendix
2, § 201(h)(1).  "Younger person.  If you are a younger person (under age 50), we
generally do not consider that your age will seriously affect your ability to adjust
to other work. However, in some circumstances, we consider that persons age 45-
49 are more limited in their ability to adjust to other work than persons who have
not attained age 45.  See Rule 201.17 in appendix 2."  20 C.F.R. §§ 404.1563(c).

in 1990, 2007, 2008, 2010, and 2011, to a high of fifty-two thousand three hundred ninety-seven dollars and forty-six cents ($52,397.46) in 2005. (Tr. 176). His total earnings during those thirty-two (32) years were five hundred thirty-eighth thousand two hundred ninety-nine dollars and fifty-six cents ($538,299.56). (Tr. 176). Plaintiff's alleged disability onset date is December 16, 2008. (Tr. 224). The impetus for his claimed disability is "back problems." (Tr. 239).

In a document entitled "Function Report - Adult" filed with the SSA, Plaintiff indicated that he lived alone in a "HUD highrise." (Tr. 264). From the time he woke up until he went to bed, he made and drank his coffee, watched television, would be "up and down the [first] 3 hours or so to loosen up," got dressed, took the elevator to his car, drove to Mount Carmel to pick up his son and his son's mother, drove them to Walmart, shopped with them in Walmart for about twenty (20) minutes, waited outside in the car until they were finished shopping, drove back to his son's house, unloaded the groceries, sat on the couch and watched television with his son, and then either went home or lied down in his son's bed for forty-five (45) minutes to two (2) hours when the "pain [had] increased [and] fatigue [had] set in." (Tr. 265-266). He indicated that he took care of his four (4) year old son, and sometimes his son's older brothers, which involved making quick meals. (Tr. 267). His son's mother's ex-husband helped

4

take care of his son.  (Tr. 267).  His back pain affected his sleep.  (Tr. 267).  He was able to take care of his personal needs, albeit slowly.  (Tr. 268).  He prepared mainly frozen and microwave meals, did one (1) load of laundry per week, drove a car, and shopped for groceries.  (Tr. 268-269).  When asked to check items which his "illnesses, injuries, or conditions affect," Plaintiff did <u>not</u> check hearing, seeing, or using his hands.  (Tr. 271).  He was able to walk about two hundred (200) yards before needing to stop and rest for about five (5) minutes.  (Tr. 271). He indicated that he used a cane "all the time" because he needed it, and that he would "only get it prescribed if [he] wanted a [third] party to pay for it."  (Tr. 272).

Regarding his concentration and memory, Plaintiff needed special reminders to take care of his personal needs and to take his medicine.  (Tr. 268).  He could count change, handle a savings account, and use a checkbook.  (Tr. 269).  He did not finish what he started, indicated that the questionnaire "lost [his] attention long ago," stated that his ability to follow written and spoken instruction depended on his pain level, and handled changes in routine "ok."  (Tr. 271-272).

Socially, Plaintiff left his apartment about five (5) days a week, and was able to go out alone.  (Tr. 269).  He saw his son daily.  (Tr. 270).  He had no hobbies or interests, and indicated that before his illnesses, injuries, and conditions

began, he was "superman." (Tr. 270).  He reported that he had  problems getting

along with family, friends, neighbors, or others due to pain which caused him to

not want to be "bothered." (Tr. 271).  Prior to the onset of his conditions, he was

social. (Tr. 271).  He could be "short" with authority figures, but was never fired

or laid off from a job because of problems getting along with others. (Tr. 272).

In a Supplemental Questionnaire regarding fatigue, Plaintiff indicated that

he began experiencing fatigue in 2005 when he started taking Vicodin, and that his

fatigue had increased as his medication had been increased "over the years." (Tr.

274).  His pain wore him out, and due to an increase, caused him to nap daily and

to lie down several times a day. (Tr. 274).

In a Supplemental Questionnaire regarding pain, Plaintiff indicated that his

pain began in 2005, and that it was stabbing, pinching, throbbing, aching, twisting,

and tightening in nature. (Tr. 275).  He stated that his pain was at a higher level

more consistently than it was when it began. (Tr. 275).  The location of his pain

went from the base of his skull, down his back, into his hips, down into the ball of

his left foot, and then sometimes into the toes of his left foot. (Tr. 275).  He

avoided any activities taking place below his waist, and weather changes increased

his pain. (Tr. 275).  His pain was worse in early mornings and when he pushed

himself. (Tr. 275).  It occurred all day, every day. (Tr. 275).  His pain medication

"took the edge off," and caused drowsiness and fatigue. (Tr. 276). Plaintiff received epidurals and engaged in home physical therapy exercises to relieve his pain, but did not attend physical therapy because it was not covered by Medicaid. (Tr. 276).

At his hearing, Plaintiff indicated that he had two (2) children, a thirty-one (31) year old daughter, and a son who was five and a half (5 ½) years old. (Tr. 44). He got along well with his immediate family and with people in general. (Tr. 49). Regarding his educational and work history, Plaintiff testified that he obtained his degree in aeronautical engineering in 1986, and his MBA at Lehigh University in 1991. (Tr. 44). At the time of the hearing, he was receiving food stamps, had a medical access card, and was living in a HUD high-rise, but was not receiving cash assistance. (Tr. 45). He stated that, since his alleged onset date of December 16, 2008, he worked as a security guard at Knoebel's amusement park in the summer of 2009, but that the job aggravated his condition. (Tr. 45). He testified that pain, having to frequently switch positions, and being easily confused caused him to voluntarily leave his position at Bucknell University. (Tr. 55). He testified that he preferred to be still working at Bucknell, explaining that "who in their right mind would do this for six or eight years and learn complete poverty just for some kind of a chance to get a small check . . . I should be out there using

my two degrees . . ."  (Tr. 56).

Regarding his mental health impairments, Plaintiff testified that he had initially been seeing a psychiatrist, Dr. Singh, weekly, and at time of the hearing, was seeing him monthly.  (Tr. 46).  He was also attending counseling and Alcoholics Anonymous ("AA").  (Tr. 46-47).  He admitted that he had been having auditory hallucinations.  (Tr. 59).  He also described that during the time when he drank alcohol years prior, he would see "all these random black cats going in front of [him]," but that when he stopped drinking, the cats appeared less and less.  (Tr. 60).  He also explained that he equated the black cats with bad signs.  (Tr. 60).

Regarding his physical limitations, Plaintiff testified that he took care of his personal needs such as bathing, grooming, and dressing every couple of days.  (Tr. 48).  He "barely [did] anything" in terms of household chores, and doing any activity from the "waist down [was] nearly impossible."  (Tr. 48).  He was able to read the news, watch movies, and use the computer.  (Tr. 48).  He also was able to fish, with his last fishing trip being the day before the hearing, but fished in a spot close to his car because he had trouble walking far distances.  (Tr. 49).  He shopped at Walmart, but was only able to "go to the back of the store once and [] back to the front."  (Tr. 49).  He testified that the last item he picked up off the

8

floor was a piece of paper. (Tr. 50). In a seated position, he was able to straighten his legs out and put them down, but it caused strain and pain in his lower lumbar area. (Tr. 50). On average, he was able to stand for about ten (10) to fifteen (15) minutes before needing to sit or lay down, and the best he could do was forty-five (45) minutes. (Tr. 51). On average, he was able to sit in a seat for twenty (20) to forty (40) minutes. (Tr. 51). He could walk about two (2) blocks, but some days was able to walk five (5) blocks. (Tr. 52-53). He was able to reach overhead. (Tr. 50). Activities that aggravated his symptoms included walking too much, lifting anything, standing too long, sitting in a certain position for too long, and driving too far. (Tr. 53). He stated that before his pain began, he worked out five (5) days a week. (Tr. 56).

In terms of daily routine, he typically woke up at about seven o'clock in the morning (7:00 a.m.), and would go to bed anytime between eight thirty in the evening (8:30 p.m.) and two thirty in the morning (2:30 a.m.). (Tr. 50). He testified that the amount of time he slept varied due to medication changes, but that at the time of his hearing, he slept about eight (8) to nine (9) hours a night, and then would get very tired in the afternoon when he would take a three (3) to four (4) hour nap. (Tr. 50-51).

With respect to medication, Plaintiff indicated that he was taking Vicodin,

Gabapentine, Flexeril, Celexa, the Fentanyl Patch, Hydroxyzine, and Risperidone. (Tr. 52-53). He testified that his medications were not very effective, but that without them, he would "kill [himself]." (Tr. 52). In terms of side effects, Plaintiff experienced a low sex drive, dry mouth, headaches, and short-term memory loss. (Tr. 52, 54). He testified that the narcotics helped his back pain, but did not help the buzzing electric-like pain in his legs; however, the Gabapentin did help the buzzing sensations. (Tr. 53). Physical therapy did not help. (Tr. 58). Plaintiff walked with a cane most of the time. (Tr. 58). The hearing concluded with a clarification for the record made by Plaintiff's attorney that, during the hearing, Plaintiff had been kneeling on the floor and leaning against the wall and behind a chair. (Tr. 60).

## MEDICAL RECORDS

Plaintiff's relevant medical records will be reviewed, including those from his alleged onset date of December 16, 2008, through the date last insured of December 31, 2012.

On January 15, 2009, Plaintiff had an appointment with Hussain Abdul-Al, M.D. at Medical House, P.C., with the request that Dr. Abdul-Al fill out disability forms. (Tr. 382). Plaintiff stated that he could not work due to back pain, and that he wanted to receive more injections as they gave him relief for several weeks at a

time.  (Tr. 382).  His medications list at this appointment included Fish Oil,

Celexa, Flexeril, and Vicodin.  (Tr. 382).  Dr. Abdul-Al's plan was for Plaintiff to

continue on these medications, and Dr. Abdul-Al completed the disability

paperwork.  (Tr. 382).

On January 26, 2009, Plaintiff visited the emergency room ("ER") at

Shamokin Area Community Hospital for back pain after a car accident.  (Tr. 308).

He underwent an x-ray of his cervical spine, which showed degenerative disc

disease ("DDD") with disc space narrowing at the C5-C6 and C6-C7 levels and

straightening of the normal cervical lordosis.  (Tr. 310).  He was diagnosed with

degenerative disc disease at the C5-C6 and C6-C7 levels in the mid to lower

lumbar area.  (Tr. 310-311).

On January 27, 2009, Plaintiff had a follow-up visit with Dr. Abdul-Al after

his car accident a day earlier.  (Tr. 384).  Plaintiff stated that he had bilateral hip

pain, lower back pain, groin pain, and numbness in his legs while he was at the

ER.  (Tr. 384).  Plaintiff was told to keep taking the Fish Oil, Celexa, Flexeril, and

Vicodin, and was not scheduled for a follow-up visit.  (Tr. 384).

On February 4, 2009, Plaintiff had an appointment with David Martin[7] at

---

7.  It is unclear from the medical records whether David Martin is a physician,
nurse, physician's assistant, or any other form of medical personnel.

Medical House, P.C., for complaints of back pain.  (Tr. 386).  It was noted that he

had a long-standing history of low back pain related to DDD that was complicated

by the recent car accident in January of 2009.  (Tr. 386).  It was also noted that

Plaintiff had prior successful visits to Pain Management at GMC, and, as a result,

requested an evaluation and treatment at this location.  (Tr. 386).  His exam

revealed diffuse tenderness over his right and left lumbar paraspinal areas with

guarding and bilateral diminished patellar reflexes.  (Tr. 386).  An MRI of

Plaintiff's lumbar spine was ordered, and Plaintiff was scheduled for a caudal

epidural injection at the Pain Management Center at GMC.  (Tr. 386).

On February 13, 2009, Plaintiff underwent an MRI of his lumbar spine.  (Tr.

363).  His diagnosis was DDD with mild central canal stenosis at the L3-4 level,

degenerative changes at the L4-5 level with previous left laminectomy, a left

paramedial to lateral disc protrusion narrowing the left lateral recess and

potentially impinging the left L5 nerve root, and mild bilateral neural foraminal

narrowing at the L4-5 level.  (Tr. 363).

On February 26, 2009, Plaintiff had an appointment with David Martin for

depression.  (Tr. 388).  It was noted that Plaintiff had been seeing Dr. Newton who

wanted to start him on Lamictal, and that Plaintiff felt that the Celexa does was not

as effective as it once was.  (Tr. 388).  Plaintiff's Celexa dosage was increased,

bloodwork was ordered, and Plaintiff was instructed to schedule an appointment with Dr. Newton at his earliest convenience.  (Tr. 388-389).

On March 4, 2009, Plaintiff had an appointment with Shaik Mohd Ahmed, MD for pain in his low back and his knees.  (Tr. 314).  It was noted that he recently had a repeat MRI which showed "changes at L3-4, L4-5" and DDD at L5-S1.  (Tr. 314).  Plaintiff completed a pain scale survey, indicating that on a scale of zero (0) to ten (10), his present pain that day was a three (3), and that he experienced: (1) a four (4) for back pain; (2) a two (2) for right leg pain; (3) a three (3) for neck pain; and (4) a zero for right arm pain.  (Tr. 317).  Plaintiff indicated that he had little interest or pleasure in any activity.  (Tr. 318).  On a scale of zero (0) to ten (10), he rated his overall back pain intensity at a two (2), his pain during personal care activities at a one (1), pain during lifting, walking, sitting, standing, and sleeping at a two (2), and pain with social life and traveling at a three (3).  (Tr. 318).  He rated his neck pain on a scale of zero (0) to ten (10) at a three (3) for pain intensity, a one (1) with personal care, a two (2) with lifting, reading, concentration, driving, sleeping, and recreation, and a three (3) for headaches and while working.  (Tr. 318).  His problems list included the following: (1) major depressive disorder; (2) anxiety; (3) insomnia; (4) post laminectomy lumbar problems; (5) lumbosacral neuritis; (6) lumbosacral DDD;

and (7) lumbosacral disc displacement.  (Tr. 320).  His outpatient medications included Flexeril, Vicodin, Celexa, Hydrocodone-Acetaminophen, and Fentanyl. (Tr. 320).  Dr. Ahmed recommended a lumbar epidural steroid injection, and Plaintiff agreed to receive this treatment.  (Tr. 314).  The indications for the injection were "spinal stenosis-lumbar, degenerative disc disease, and neuropathic pain."  (Tr. 314).  Plaintiff received the injection at this appointment, and was scheduled for a follow-up visit in two (2) months.  (Tr. 315).

On March 9, 2009, Plaintiff had an appointment with David Martin for neck pain.  (Tr. 390).  An MRI of the cervical spine was ordered, and physical therapy, along with a continuation of the medications Plaintiff had already been taking, including Fish Oil, Celexa, Flexeril, and Vicodin, was prescribed.  (Tr. 390). Plaintiff was scheduled for a follow-up appointment in one (1) month.  (Tr. 390).

On March 24, 2009, Plaintiff had an appointment with David Martin with a request of an increase in his Vicodin dosage.  (Tr. 392).  In the "History of Present Illness" section, it was noted that Plaintiff had been seen by Martin for low back pain that had been causing numbness in his bilateral lumbar spine area with radiation to both hips and legs.  (Tr. 392).  Plaintiff stated that when he sat still for about forty-five (45) minutes, he would develop numbness in his bilateral hip area with radiation down along his sciatic nerves to his bilateral heels.  (Tr. 392).  It

was noted that Plaintiff was enrolled in physical therapy and was awaiting approval for an MRI of his lumbar spine and bilateral hip areas. (Tr. 392).

On April 22, 2009, Plaintiff had a follow-up appointment for his neck and back pain with David Martin. (Tr. 394). It was noted that Plaintiff could not attend physical therapy "because of insurance problems," but Plaintiff had been exercising on his own and noted an improvement in his general condition. (Tr. 394). His medications list at this appointment included Vicodin, Celexa, Fish Oil, and Flexeril, but Plaintiff indicated that he had been using his pain medications on a "downscale" and did not need any refills at that time. (Tr. 394). Plaintiff had a full range of motion in his neck, and was told to follow-up as needed. (Tr. 394).

On June 5, 2009, Plaintiff received a caudal epidural steroid injection performed by Dr. Ahmed for his lumbar spinal stenosis and DDD, lumbosacral neuritis, and neuropathic pain. (Tr. 327). More specifically, Plaintiff indicated that his pain was located in his lower back bilaterally with radiation into his buttocks bilaterally, rated this pain at a three (3) out of ten (10), and described it as constant in nature. (Tr. 328). It was also noted that Plaintiff received good temporary pain relief of his hip pain from the March 4, 2009 lumbar epidural steroid injection. (Tr. 328). Plaintiff tolerated the injection, and was scheduled for a follow-up in three (3) months. (Tr. 328).

On July 2, 2009, Plaintiff had an appointment with David Martin for refills of his pain medication.  (Tr. 396).  It was noted that he had a caudal epidural block done in June that did not help as well as it had in the past and that his condition had recently been aggravated by sleeping on the ground during a camping trip.  (Tr. 396).  His neck had a full range of motion, and an exam of his spine revealed bilateral lumbar tenderness with negative straight leg lift pain.  (Tr. 396).  Plaintiff was told to continue on Celexa, Fish Oil, and Flexeril, was prescribed a new medication called Duragesic, and was scheduled for a follow-up appointment in three (3) months.  (Tr. 396).

On July 10, 2009, Plaintiff had a follow-up appointment with David Martin to discuss the newly prescribed Duragesic patch for pain control.  (Tr. 398).  He reported that he still had been having pain with using only the patch for pain control, but the Vicodin in combination with the patch gave him better relief.  (Tr. 398).  His exam revealed a full range of motion in his neck and bilateral lumbar pain radiating to his bilateral hips.  (Tr. 398).  He was scheduled with GMC Pain Management in the upcoming weeks.  (Tr. 398).

On July 30, 2009, Plaintiff had an appointment with David Martin.  (Tr. 400).  Plaintiff was advised to use Duragesic as his main pain management control and that Vicodin should only be used for breakthrough symptoms.  (Tr. 400).

On September 8, 2009, Plaintiff presented to Dr. Ahmed for a caudal epidural steroid injection for lumbar spinal stenosis and DDD, lumbosacral neuritis, and neuropathic pain.  (Tr. 337).  He indicated he had been experiencing pain in his lower back, hips, and legs, and rated his pain at a four (4) out of ten (10).  (Tr. 339).  Plaintiff tolerated the procedure well, and was scheduled for a follow-up visit in three (3) months.  (Tr. 338).

On September 8, 2009, Dr. Hussain Abdul-Al filled out a Clinical Assessment of Pain form.  (Tr. 346).  Dr. Abdul-Al opined the following: (1) Plaintiff's pain was present to such an extent as to be distracting to adequate performance of daily activities and/ or work; (2) Plaintiff experienced greatly increased pain in relation to physical activities such as walking, standing, bending, stooping, and moving of extremities to such a degree as to cause distraction from or total abandonment of a task; (3) Plaintiff's medications could be expected to cause some mildly troublesome side effects; (4) Plaintiff's pain and/ or prescribed medication would present some limitations on his ability to perform his previous work, but not to such a degree as to create serious problems in most instances; (5) Plaintiff's pain would remain a significant element in his life, although it may lessen in intensity or frequency in the future; and (6) treatments for his pain had no appreciable effect or have only briefly altered the level of pain.  (Tr. 346-348).

17

On September 28, 2009, Plaintiff had an appointment with David Martin due to numbness on the bottom of his left foot that had been occurring for six (6) weeks and was associated with standing and walking a lot while working at the amusement park.  (Tr. 404).  He reported that the epidural he received three (3) weeks earlier at GMC resulted in a slight improvement, and that he had obtained fairly adequate pain relief of his lower back with the prescription medications. (Tr. 404).  Upon examination, Plaintiff had a full range of motion in his neck, and his feet and lower extremities were normal to inspection and palpation.  (Tr. 404). Plaintiff was instructed to continue on his medications, including Duragesic, Colase, Vicodin, Celexa, Fish Oil, and Celexa.  (Tr. 404).

On October 19, 2009, Plaintiff had an appointment with Dr. Abdul-Al for "cascading pain" through the left side of his body, increasing lower back pain that radiated into his left foot and leg, and bilateral groin pain.  (Tr. 406).  It was noted that he was "concerned about the future of his back, and the effect of this on his work ability . . ."  (Tr. 406).  In the comments section of the medical record from this appointment, it was stated that Plaintiff had been seen by Dr. Lin at "sun ortho" who had suggested surgery, and was also seen by Dr. Andrychack who offered him surgery for DDD, but Plaintiff declined.  (Tr. 406).  Plaintiff had been previously treated with Neurontin and Cymbalta, but he "could not work with both

18

of them . . ."  (Tr. 406).  Dr. Abdul-Al suggested that Plaintiff not be involved in physical kind of work, but that he would be able to do sedentary work.  (Tr. 406).

On December 15, 2009, Plaintiff had a follow-up appointment with Dr. Abdul-Al.  (Tr. 408).  Plaintiff indicated that he had not been taking Neurontin, that his back pain was stable with some days worse than others, that he continued to have numbness in his left foot, and that he was feeling depressed, but not taking his Celexa. (Tr. 408).  His examination revealed that he had a full range of motion in his neck, and that his extremities did not show any clubbing, cyanosis, or edema.  (Tr. 408).  His Assessment Diagnoses included DDD and Depressive Disorder.  (Tr. 408).  He was instructed to continue taking his medications, including Colace, Flexeril, Neurontin, Medrol, Fish Oil, Cialis, Vicodin, Duragesic, and Celexa, and was scheduled for a follow-up visit in six (6) months. (Tr. 408-409).

On December 16, 2009, Plaintiff had an appointment with licensed professional counselor Gene Brosius at Mount Carmel Mental Health Center.  (Tr. 665).  It was noted that Plaintiff had made some progress with improving his coping skills, following his medication prescriptions, and improving his relationship with his partner.  (Tr. 665).  His exam revealed the following: a depressed mood, a normal and appropriate affect, a normal mental status, that

Plaintiff was active and eager to participate in his treatment, and that his response to treatment was as expected.  (Tr. 665).  In the "Other Observations/ Evaluations" section, it was noted that Plaintiff returned as a patient after two (2) years, that he was depressed, that occupational and relationship issues continued to be a point of focus, and that he continued to seek help with employment.  (Tr. 665).  He was scheduled for a weekly follow-up.  (Tr. 665).

On January 12, 2010, Plaintiff had an appointment with Dr. Abdul-Al for increasing neck problems.  (Tr. 410).  He stated that he had been experiencing numbness in his upper extremities that was affecting his sleep because his "whole arm [was] numb" when he went to bed, but the numbness went away in the morning when he woke up and shook his hands.  (Tr. 410).  His exam revealed that he had no motor dysfunction in his upper extremities.  (Tr. 410).

On January 13, 2010, Plaintiff had an appointment with Gene Brosius at Mount Carmel Mental Health Center.  (Tr. 666).  It was noted that Plaintiff had made some progress with improving his coping skills, following his medication prescriptions, and improving his relationship with his partner.  (Tr. 666).  His exam revealed the following: a normal/ euthymic mood, a normal and appropriate affect, a normal mental status, that Plaintiff was active and eager to participate in his treatment, and that his response to treatment was as expected.  (Tr. 666).  In the

20

"Other Observations/ Evaluations" section, it was noted that Plaintiff continued to have occupational and relationship issues, and that he had applied for a part-time position with a bus company.  (Tr. 666).  He was scheduled for a bi-weekly follow-up.  (Tr. 666).

On January 27, 2010, Plaintiff had an appointment with Gene Brosius at Mount Carmel Mental Heath Center.  (Tr. 667).  It was noted that Plaintiff had made some progress with improving his coping skills, following his medication prescriptions, and improving his relationship with his partner.  (Tr. 667).  His exam revealed the following: a depressed mood, a normal and appropriate affect, a normal mental status, that Plaintiff was active and eager to participate in his treatment, and that his response to treatment was as expected.  (Tr. 667).  In the "Other Observations/ Evaluations" section, it was noted that Plaintiff was depressed.  (Tr. 667).  He was scheduled for a bi-weekly follow-up.  (Tr. 667).

On February 5, 2010, Plaintiff underwent an MRI of his cervical spine.  (Tr. 365).  The report noted that there were anterior osteophytes at the C5-6 and T3-4 levels, a broad-based bulge with a right paracentral protrusion at C5-6 with stenosis of the canal and neural foramina, a disc bulge eccentric to the left at C7-T1 that extended into the lateral recess on the left, and left paracentral herniations at the T2-3 and T3-4 levels.  (Tr. 365).  The impression was that Plaintiff had

cervical spondylosis with findings most significant at the C5-6 and C7-T1 levels. (Tr. 365).

On March 5, 2010, Plaintiff underwent an EMG Electrodiagnostic Study performed by Glen A. Marino, M.D. for arm and hand numbness and pain.  (Tr. 349).  The test concluded that Plaintiff had bilateral median neuropathy of the wrist, otherwise known as Carpal Tunnel Syndrome, with very mild demyelination on the left and early moderate demyelination on the right, and had chronic cervical radiculopathy at the C7-C8 distribution on the left with normalization of the cervical paraspinal muscles and borderline suggestion of a similar pattern developing on the right.  (Tr. 350).  The "Discussion" section of the report noted that Plaintiff already had known lumbar degenerative disc disease, and that the EMG test suggested cervical disc disease with probable foraminal narrowing.  Dr. Marino suggested that Plaintiff sleep with bilateral carpal tunnel wrist braces and that Plaintiff's neck complaints would benefit from physical therapy.  (Tr. 350).

On March 5, 2010, Plaintiff underwent a Functional Capacity Exam ("FCE") performed by Sharon Collins, RN.  (Tr. 355-357).  Nurse Collins reviewed Plaintiff's medical records, and concluded that these records demonstrated a progression of DDD, and that his pain was exacerbated by siting, standing, and activity.  (Tr. 355-357).  She stated that, due to the severity and

22

ongoing progression of his DDD, the need for narcotic medication, and the

restrictions to his activities, it "would be very difficult for him to return to work at

this time." (Tr. 357).

On March 5, 2010, Dave Bledsoe from Bledsoe Occupational Therapy

wrote a letter to David Martin. (Tr. 354). In this letter, it is noted that Plaintiff

had worked for three (3) months as a security guard, but had to stop due to foot

pain, increasing back pain, and a need for medication. (Tr. 354). Plaintiff told

Mr. Bledsoe that he would not take his medications, which included Flexeril,

Celexa, Vicodin, and Fentanyl, on his days off so that he could "double up" on his

working days. (Tr. 354). Plaintiff was noted as requiring a cane to walk. (Tr.

354). Mr. Bledsoe concluded that long-term success of a return to work was not

demonstrated. (Tr. 354).

On March 25, 2010, Plaintiff underwent an examination by Rodwan K.

Rajjoub, M.D. (Tr. 359). Plaintiff complained of cervical spine pain, bilateral arm

numbness, chronic pain in his lower back and his posterior left leg radiating to his

toes, and on and off numbness radiating from his knee to his toes. (Tr. 359). It

was noted that Plaintiff had depression. (Tr. 359). His exam revealed he was

oriented to time, person, and place, had a memory within normal limits for his age,

had no definite weakness in terms of motor strength, and that he walked with a

cane.  (Tr. 360).  It was noted that an MRI performed on February 5, 2010

revealed DDD at the C4-C5 and C5-C6 levels with mild disc bulging, and a small

disc protrusion at the right C5-C6 level.  (Tr. 361).  It was also noted that Plaintiff

underwent an EMG on January 18, 2010, which revealed Plaintiff had bilateral

median neuropathy at the wrist on the left and very mild median neuropathy on the

right and had chronic cervical radiculopathy at the C7-C8 distribution on the left

with normalization of the cervical paraspinal muscles and a borderline suggestion

of a similar pattern on the right.  (Tr. 361).  Dr. Rajjoub's impression was that

Plaintiff had bilateral cervical radiculopathy, cervical pain, small herniated

nucleus pulposus at the right C5-C6 disc, cervical DDD at the C4-C5 and C5-C6

levels, entrapment of the median nerve in his wrists bilaterally, chronic low back

pain syndrome, and status post lumbar laminectomy at the L4-L5 level.  (Tr. 361).

Based on these findings, Dr. Rajjoub's did not recommend surgery, and advised

Plaintiff to continue with conservative treatment.  (Tr. 361).

On January 14, 2011, Plaintiff had an appointment with Dr. Abdul-Al for

complaints of numbness in his left arm, thumb, and index finger that also radiated

into his elbow.  (Tr. 414).  He indicated that looking up and rotating his head made

the numbness worse, and denied weakness of his upper extremities.  (Tr. 414).

His medications list included Duragesic, Vicodin, Fish Oil, Flexeril, Cialis, and

Celexa.  (Tr. 414).  Plaintiff was instructed to keep taking his medications, and was prescribed a Lyrica.  (Tr. 414).

On February 18, 2011, Plaintiff underwent a consultative examination performed by Sanjay Sen, M.D. of the BDD.  (Tr. 416-419).  Plaintiff's chief complaints were constant lower back pain, neck pain that radiated to the top of his head and caused a pins and needles sensation in the left lateral two (2) fingers that radiated upwards towards his bicep muscles, and right groin pain.  (Tr. 416).  It was noted that these problems had been occurring since March of 2006, and that Plaintiff was "mobilizing with a cane [on] the left side."  (Tr. 416).  His musculoskeletal system exam revealed that he had a normal range of motion in his shoulders, elbows, and wrists and one hundred percent (100%) grip strength in both of his hands.  (Tr. 418).  His strength was rated at a five (5) out of five (5) for both upper extremities and his lower right extremity, and a four (4) out of five (5) in his lower left extremity with exaggerated reflex in his left knee joint area.  (Tr. 418).  In the "Work-Related Activity" Section, Dr. Sen noted that Plaintiff could lift and carry twenty (20) pounds, stand with a cane for thirty (30) minutes, walk with a cane for thirty (30) minutes, sit for thirty (30) minutes, could push and pull, and could "do mild weight with legs [and] moderate weight with hands."  (Tr. 418).  Plaintiff could occasionally bend, kneel, stoop, crouch, and climb steps and

could never balance. (Tr. 419). Dr. Sen's impressions included the following: DJD of the cervical spine; DJD of the lumbosacral spine with left radiculopathy; and depression. (Tr. 419). Dr. Sen indicated that Plaintiff would benefit from imaging studies of the lumbosacral spine, an orthopedic evaluation, physical therapy, and quitting smoking. (Tr. 419).

On March 30, 2011, Theodore Waldron, D.O. performed a Physical Residual Functional Capacity ("RFC") Assessment for Plaintiff. (Tr. 421-426). Plaintiff's primary diagnosis listed was cervical spondylosis, and the secondary diagnosis listed was post lumbar laminectomy syndrome. (Tr. 421). Dr. Waldron opined that Plaintiff could occasionally lift and/ or carry twenty (20) pounds, frequently lift and/ or carry ten (10) pounds, stand and/or walk for four (4) hours in an eight (8) hour workday, sit for about six (6) hours in an eight (8) hour workday, could engage in unlimited pushing and pulling within the aforementioned weight limitations, could occasionally climb ramps and stairs, could never climb ladders, ropes or scaffolds, could occasionally balance, could occasionally stoop, could occasionally kneel, could occasionally crouch, and could occasionally crawl. (Tr. 422-423). Dr. Waldron further opined that there were no manipulative limitations established, including reaching, handling, fingering, and feeling. (Tr. 423). In terms of environmental limitations, Plaintiff was to avoid

26

concentrated exposure to cold, wetness, and vibration, but was unlimited in

exposure to heat, humidity, noise, fumes, odors, gases, dusts, poor ventilation, and

hazards.  (Tr. 424).  In the explanation section of the Physical RFC Assessment,

Dr. Waldron stated the following:

> [Plaintiff] alleges disability due to back problems, pseudoclaudication in both arms, pain and fatigue.  He alleges that these symptoms result in limitations in standing, walking, lifting, carrying, bending, pushing, pulling, climbing, balancing, stooping, kneeling, crouching, crawling, squatting, reaching, performing at a consistent pace and completing daily activities.  The medical evidence establishes a medically determinable impairment of cervical spondylosis, post lumbar laminectomy syndrome, CTS.
>
> C/O neck and back pain, carpal tunnel syndrome, and post laminectomy syndrome. [Plaintiff] is s/o ATV accident in 2004.  Had prior laminectomy left L4-5.  Has had chronic low back pain syndrome.  Also had MRI evidence of degenerative disk disease at C5-4 and C5-6 with disc bulging and a small protrusion at C5-6 on right side.  No herniated nucleus pulpous noted (Dr. Abdul-Al).  Electrodiagnostic study 1/18/10 revealed bilateral carpal tunnel syndrome, cervical radiculopathy at C7-8 (chronic distribution).  No surgical intervention was recommended.  At recent exam, [Plaintiff] was 72-1/2"tall and 206.7 lbs.  The bp was 118/74.  Nsr+r.  Lungs clear. No edema.  Motor was 5/5 for all except for LLE (4/5).  Grip 100% bilaterally. [Plaintiff] was using a cane (per his own discretion).
>
> In assessing the credibility of [Plaintiff's] statements regarding symptoms and their effects on function, his medical history, the character of his symptoms, his activities of daily living, the type of treatment he received, his response to treatment, his

work and history, and the consistency of the evidence were considered.

[Plaintiff] has described daily activities that are significantly limited. This is consistent with the limitations indicated by other evidence in this case. The medical evidence shows that despite ongoing treatment, he continues to have pain which significantly impacts on his ability to perform work related activities. Furthermore, he has pursued appropriate follow-up care for his impairments. He received treatment from a specialist for his impairments.

Of greatest significance in determining the credibility of [Plaintiff's] statements regarding symptoms and their effects on his functioning were his medical history, the character of his symptoms, type of treatment he received, his response to the treatment he received his work history and the consistency of the evidence. Fairly persuasive were his ADLs. Based on the evidence of record, [Plaintiff's] statements are found to be partially credible.

(Tr. 426).

On August 3, 2011, Plaintiff had an appointment with Dr. Abdul-Al to discuss alternatives to replace the Duragesic patch because his medical assistance would love longer pay for it. (Tr. 683). Plaintiff stated his neck was much better, his back was the same, and his pain in general was manageable at a three (3) to a five (5) out of ten (10) on the pain scale. (Tr. 683). His exam revealed a full range of motion in his neck, and no clubbing, cyanosis, or edema in his extremities. (Tr. 683). He was prescribed a new medication, Kadian, and was

instructed to continue taking his other medications, including Omeprazole,

Vicodin, Fish Oil, and Flexeril, to discontinue taking Duragesic, and to follow-up

"as per schedule."  (Tr. 683-684).

On October 21, 2011, Plaintiff had an appointment with Dr. Abdul-Al for

leg and back pain.  (Tr. 685).  Plaintiff stated that he had been having lower back

pain, that his legs had been throbbing, that he felt weak, and that he sometimes had

groin pain.  (Tr. 685).  Plaintiff appeared to be healthy and well-developed, had a

weight within the normal range, had weakness in his lower extremities, and had

hyporeflexia in both knees.  (Tr. 685).  Dr. Abdul-Al ordered MRIs of Plaintiff's

lumbar and thorasic spine, added Lyrica to Plaintiff's medications, discontinued

Kadian, Celexa, and Fish Oil, and instructed Plaintiff to continue taking

Duragesic, Citalopram Hydrobromide, Omeprazole, Vicodin, and Flexeril.  (Tr.

685-686).

On November 8, 2011, Plaintiff underwent MRIs of his thoracic and lumbar

spine, which were ordered by Dr. Abdul-Al due to Plaintiff's complaints of back

and neck pain.  (Tr. 434-435).  The thoracic MRI impression was that there were a

number of levels where there were "small disks or disk and osteophyte formation

in the thoracic spine" which did not appear to be compromising the cord, but did

appear to cause some "mild narrowing of the neural foramen" at the T2-T3 and

T9-T10 levels.  (Tr. 434).  The lumbar MRI revealed that there was circumferential disc bulging at the L3-L4 level with mild fact and ligamentous hypertrophy causing mild stenosis.  At the L4-L5 level, there was evidence of some mild to moderate narrowing of both neural foramina.  (Tr. 435).  The lumbar MRI impression was that, aside from the post-surgical changes from Plaintiff's prior L4-L5 disc removal, there were no other "significant interval changes from the patient's previous study with the exception that there is much more extensive bony changes in the L4 vertebral body than was seen previously."  (Tr. 435).

On November 21, 2011, Plaintiff had an appointment with Dr. Abdul-Al. (Tr. 687).  Plaintiff stated he was seen by a psychiatrist in the past, had been diagnosed with Bipolar Disease, and was placed on Lamictal, but was not taking any medications at the time of the appointment.  (Tr. 687).  He also stated that Neurontin was helping significantly with his lower back pain, and requested an increased dose.  (Tr. 687).  Plaintiff's diagnoses at this appointment included DDD, Depressive Disorder, and possible Bipolar Disease.  (Tr. 687).  Plaintiff was instructed to schedule an appointment with a psychiatrist, and to follow-up with Dr. Abdul-Al as per the schedule.  (Tr. 687-688).

On January 6, 2012, Plaintiff had an appointment with Gurdial Singh, M.D. at General Adult and Geriatric Psychiatry for an initial psychiatric evaluation.  (Tr.

690).  Plaintiff reported that he believed he had a mood disorder, that he was

taking Celexa daily, that he had to stop seeing a psychiatrist because of loss of

insurance, that he had been experiencing a lot of ups and downs in his mood, and

that he had been feeling depressed and anxious.  (Tr. 690).  He also had been

having bad thoughts that "tortured him" and that he could not stop.  (Tr. 690).  He

denied suicidal thoughts, hallucinations, and paranoia.  (Tr. 690).  Plaintiff also

noted that he was taking Neurontin three (3) times a day for his back pain.  (Tr.

690).  Plaintiff's primary concern was that he was becoming very depressed as

time passed, but he noted that he was more willing to receive help and showed

more insight.  (Tr. 691).  He had no history of psychiatric hospitalization or

suicide attempts.  (Tr. 691).  Past medications included Zoloft and Prozac.  (Tr.

690).  Dr. Singh's exam revealed that Plaintiff was impatient during questioning,

but that he was pleasant and expressive and had a relevant and coherent thought

process.  (Tr. 691).  Dr. Singh also noted that there was no looseness of

association, flight of ideation, or psychotic symptoms.  (Tr. 691).  Plaintiff's Axis

I diagnosis was Bipolar Type II recurrent without psychotic features and with

depression, and his Global Assessment of Functioning ("GAF")[8] score was a forty

---

8.  The GAF score, on a scale of 1-100, allows a clinician to indicate his judgment
of a person's overall psychological, social and occupational functioning, in order
to assess the person's mental health illness.  American Psychiatric Association

(40).  (Tr. 691).  Dr. Singh prescribed Lamictal and an increase in Neurontin.  (Tr.

_____

(2000).  Diagnostic and Statistical Manual of Mental Disorders (4th ed., text rev.).  Washington, DC: Author.  A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range.  Id.  The score is useful in planning treatment and predicting outcomes.  Id.  The GAF rating is the single value that best reflects the individual's overall functioning at the time of examination.  The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning.  The GAF is within a particular range if either the symptom severity or the social and occupational level of functioning falls within that range.  When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the worse of the two.  Thus, a suicidal patient who is gainfully employed would have a GAF rating below 20.  A GAF score of 21-30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas.  Id.  A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood.  Id.  A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning.  Id.  A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning.  Id.  A GAF score of 61-70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning.  Id.  Recently, the American Psychiatric Association no longer uses the GAF score for assessment of mental disorders due to concerns about subjectivity in application and a lack of clarity in the symptoms to be analyzed.  Solock v. Astrue, 2014 U.S. Dist. LEXIS 81809, *14-16 (M.D. Pa. June 17, 2014) (citing Ladd v. Astrue, 2014 U.S. Dist. LEXIS 67781 (E.D. Pa. May 16, 2014)); See Am. Psychiatric Assoc., Diagnostic and Statistic Manual of Mental Disorders 5d, 16 (2013).  As a result, the SSA permits ALJs to use the GAF score as opinion evidence when analyzing disability claims involving mental disorders; however, a "GAF score is never dispositive of impairment severity," and the ALJ, therefore, should not "give controlling weight to a GAF from a treating source unless it is well[-]supported and not inconsistent with other evidence."  SSA AM-13066 at 5 (July 13, 2013).

691).

On January 21, 2012, Plaintiff had an appointment at Behavioral Health Services.  (Tr. 149).  At this appointment, it was noted that Plaintiff had good eye contact, a dysphoric mood, a flat affect, spontaneous and relevant speech, appropriate responses, and good verbal and listening skills.  (Tr. 698).  The treatment plan was for Plaintiff to take his prescribed medications and attend his next therapy session for depression, pain, frustration, and memory lapses.  (Tr. 698).

On February 6, 2012, Plaintiff "stopped into [Dr. Singh's] office" even though his appointment was not scheduled for that day.  (Tr. 692).  He reported that he was having trouble with forgetfulness, that he increased his Neurontin and Lamictal, and that he was using a cane to ambulate.  (Tr. 692).  His examination revealed that he was pleasant, friendly, cooperative, comfortable, appreciative of being able to be seen, and "humbled about his forgetfulness and level of functioning."  (Tr. 692).  He was scheduled for a re-check in one (1) month.  (Tr. 692).

On February 10, 2012, Plaintiff had an appointment at Behavioral Health Services.  (Tr. 699).  He stated he had been feeling a little better and that Dr. Singh had increased his Lexapro dosage.  (Tr. 699).  His examination revealed he had

good eye contact, a dysphoric mood, a blunted affect, spontaneous and relevant speech, appropriate responses, low self esteem, adequate hygiene, and a loss of concentration. (Tr. 699). His treatment plan was to continue taking his medications as prescribed, and to use positive coping skills. (Tr. 699). He was scheduled for a follow-up on March 16, 2012. (Tr. 699).

On February 20, 2012, Plaintiff "walked into [Dr. Singh's] office" in a state of panic. (Tr. 693). He reported that he experienced feelings of immense fear like a panic attack while driving a friend twenty-five miles away from where Dr. Singh's office was located, and that his mind was racing. (Tr. 693). He stated that the increased Neurontin and Lamictal doses were not helping. (Tr. 693). Dr. Singh performed a mental status examination, and found Plaintiff to be in acute state of crisis like a panic attack as he was tearful, helpless, and embarrassed. (Tr. 693). Dr. Singh prescribed Visatril, reduced the Lamictal dosage, and scheduled a reevaluation appointment for Plaintiff for one (1) week later. (Tr. 693).

On February 27, 2012, Plaintiff had an appointment with Dr. Singh. (Tr. 694). Plaintiff indicated that he was not taking the Lamictal, did not feel well, was always depressed, was confused, felt lost and helpless, felt as if he had no control over his life, had a lot of difficulty making decisions, was easily frustrated, and experienced periods of derealization and depersonalization. (Tr. 694). Dr. Singh

34

prescribed Risperdal and scheduled Plaintiff for a re-check two (2) weeks later.

(Tr. 694).

On March 13, 2013, Plaintiff had an appointment with David Andreychik,

M.D. at Geisinger Medical Center for the following complaints: (1) neck pain that

was centered below where the cervical spins meets the thoracic spine on the right

side and that felt like a dull ache that would come and go; (2) severe spasms in

between his shoulder blades for ten (10) to fifteen (15) seconds at a time; (3)

thoracic pain around his midback that "came around the ribs" that flared up when

his lumbar pain flared up; (4) constant pain and stiffness in his lumbar spine that

felt like a heavy pressure and burning and stabbing pain mostly "around L3-4 and

L4-5;" (5) pain in his left testicle when walking too much; and (6) leg pain that

caused his legs to feel like they were "ready to explode" and that was "buzzing or

electric in nature."  (Tr. 701-702).  Plaintiff stated that he was unable to find a

comfortable position and therefore had to alternate between sitting and standing,

could only walk a couple of blocks before his leg pain would increase, and that his

back pain was worse than his neck pain.  (Tr. 702).  A physical exam revealed the

following: (1) no weakness in his bilateral lower extremities; (2) symmetric

strength in his bilateral lower extremities; (3) intact sensation in his bilateral lower

extremities; and (4) a "little bit of a staggered swing with a shorter leg swing on

the left leg than on the right."  (Tr. 702).  His imaging studies were reviewed, which showed the following: (1) DDD and lumbar stenosis at L3-4 and L4-5; and (2) "a C7-T1 disk and a C6-7 mild disk, but no real pathology there, and as he [was] mostly symptomatic from his neck, [Dr. Andreychik] [felt] it [was] not contributing to his symptoms, especially since there [was] no cord  in relation to this."  (Tr. 702).  His diagnosis was lumbar stenosis.  (Tr. 702).  Plaintiff and Dr. Andreychik discussed a possible L3-L4 and L4-L5 laminectomy and fusion as a surgical option.  (Tr. 702).  Plaintiff was scheduled for a follow-up appointment in four (4) months, and was instructed to call if he decided he wanted to have the surgery before this appointment.  (Tr. 702-704).

On March 16, 2012, Plaintiff had an appointment at Behavioral Health Services.  (Tr. 700).  When asked how he had been doing, he responded that he saw "cats behind [him] now so [he] guess[ed] that [meant he was] moving forward."  (Tr. 700).  He also indicated that he continued to have pain daily and was considering surgery as an option to control it.  (Tr. 700).  His exam revealed poor eye contact, a dysphoric mood, a blunted affect, spontaneous speech, adequate hygiene, difficulty walking, and active listening.  (Tr. 700).

On April 21, 2012, Plaintiff had an appointment at Behavioral Health Services.  (Tr. 695).  He reported experiencing memory loss, depression, suicidal

ideations, an inability to complete tasks, chronic back pain, and low self-esteem.

(Tr. 696).  His diagnoses was moderate to severe Bipolar Disorder.  (Tr. 695).  His

treatment plan included taking his medications, attending scheduled therapy

sessions and Alcoholics Anonymous meetings, and learning and using positive

coping skills.  (Tr. 696).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of

all legal issues decided by the Commissioner.  See Poulos v. Commissioner of

Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of

Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55

F.3d 857, 858 (3d Cir. 1995).  However, the court's review of the Commissioner's

findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those

findings are supported by "substantial evidence."  Id.; Mason v. Shalala, 994 F.2d

1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).

Factual findings which are supported by substantial evidence must be upheld.  42

U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where

the ALJ's findings of fact are supported by substantial evidence, we are bound by

those findings, even if we would have decided the factual inquiry differently.");

Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the

Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the

record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340

U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the

Commissioner ignores countervailing evidence or fails to resolve a conflict

created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must

indicate which evidence was accepted, which evidence was rejected, and the

reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d

at 706-07. Therefore, a court reviewing the decision of the Commissioner must

scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir.

1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, including supplemental security income, the

plaintiff must demonstrate an "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment

which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months." 42 U.S.C. §

432(d)(1)(A). Further,

> [a]n individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which

39

exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and claims for disability insurance benefits. See 20 C.F.R. § 404.1520; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four, the Commissioner must determine the claimant's residual functional capacity. Id. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled. Id. "The claimant bears the ultimate burden of establishing steps one through four." Residual functional capacity is the individual's maximum

40

remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996).  A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule.  The residual functional capacity assessment must include a discussion of the individual's abilities.  Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").  "At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity. " Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004).

## ALJ DECISION

Initially, the ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through the date last insured of December 31, 2012.  (Tr. 18).  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful work activity from his alleged onset date of December 16,

2008. (Tr. 18).

At step two, the ALJ determined that Plaintiff suffered from the severe[9] combination of impairments of the following: "degenerative disc disease and degenerative joint disease of the cervical spine, thoracic spine and lumbar spine, status-post lumbar discectomy and laminectomy; cervical radiculopathy; bipolar disorder; and depressive disorder (20 C.F.R. 404.1520(c) and 416.920(c))." (Tr. 18).

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). (Tr. 19).

At step four, the ALJ determined that Plaintiff had the RFC to perform light work. (Tr. 22). Specifically, the ALJ stated the following:

---

9. An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.921. Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

> After careful consideration of the entire record, the undersigned
> finds that [Plaintiff] has the [RFC] to perform light work as
> defined in 20 C.F.R. 404.1567(b) and 416.967(b), however,
> that light work would be limited: he would have a left upper
> extremity push/ pull limitation; he can perform occasional
> climbing, balancing and stooping, but never on ladders; he
> must avoid temperature extremes, humidity, vibration, and
> hazards; [Plaintiff] is limited to simple, routine tasks and low
> stress, defined only as occasional decision-making required and
> only occasional changes in the work setting.

(Tr. 22).

At step five of the sequential evaluation process, because Plaintiff could not

perform any past relevant work, and considering the his age, education, work

experience, and RFC, the ALJ determined "there are jobs that exist in significant

numbers in the national economy that the [Plaintiff] can perform (20 C.F.R.

404.1569, 404.1569(a), 416.969, and 416.969(a))." (Tr. 30-31).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined

in the Social Security Act at any time between December 16, 2008, the alleged

onset date, and the date of the ALJ's decision. (Tr. 31).

## DISCUSSION

On appeal, Plaintiff asserts the following arguments: (1) the ALJ erred in

finding that Plaintiff's cervical spondylosis and radiculopathy, status post lumbar

discectomy and laminectomy, lumbar stenosis, carpal tunnel syndrome, and

degenerative disc disease and degenerative joint disease of the lumbar, cervical and thoracic spine did not meet Listing 1.04, Disorders of the Spine; (2) the ALJ did not provide an adequate explanation for rejecting the opinions of his treating and examining sources and failed to consider the factors provided by 20 C.F.R. 416.927 and 404.1527(d) and Social Security Rulings 96-2p and 96-5p; (3) the ALJ erred in determining Plaintiff's credibility and did not properly evaluate Plaintiff's subjective complaints in accordance with 20 C.F.R. 416.929 and Social Security Rule 96-7(p); and (4) the ALJ erred in determining that Plaintiff could not perform past relevant sedentary work, but could perform light work.  (Doc. 11, pp. 3-10).  Defendant disputes these contentions.  (Doc. 16, pp. 17-37).

## 1.  Impairment Listings

In his brief, Plaintiff initially contends that the ALJ erred in finding that Plaintiff's cervical spondylosis and radiculopathy, status post lumbar discectomy and laminectomy, lumbar stenosis, carpal tunnel syndrome, degenerative disc disease and degenerative joint disease of the lumbar, cervical and thoracic spine, Bipolar Disorder, and Depressive Disorder did not meet any Listings.  (Doc. 11, pp. 4-6).  With regards to Plaintiff's argument that the ALJ erred in finding that his Carpal Tunnel Syndrome, Bipolar Disorder, and Depressive Disorder did not meet the respective Listing requirements, because Plaintiff failed to support this

44

contention asserted in his brief in support and did not even make reference to a respective Listings for these impairments, this argument has been waived and is not proper for consideration by this Court.  See Harris v. Dow Chemical Co., 2014 WL 4801275 (3d Cir. Sept. 29, 2014) (holding that an argument is waived and abandoned if briefly mentioned in the summary of the argument, but not otherwise briefed); Laborers' Int'l Union of N. America, AFL-CIO v. Foster Wheeler Corp., 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it . . . and . . . 'a passing reference to an issue . . . will not suffice to bring that issue before this court.'") (citing Frey v. Grubine's RV, 2010 WL 4718750, at *8 (M.D. Pa. Nov. 15, 2010)); Karchnak v. Swatara Twp., 2009 WL 2139280, at *21 (M.D. Pa. July 10, 2009) ("A party waives an issues if it fails to brief it in its opening brief; the same is true for a party who merely makes a passing reference to an issue without elaboration.") (citing Gorum v. Sessions, 561 F.3d 179, 185 n.4 (3d Cir. 2009)).  As such, because Plaintiff has failed to brief this assertion, but rather only made a passing reference in his brief, Plaintiff has waived his contention that the ALJ erred in finding that his Carpal Tunnel Syndrome, Bipolar Disorder, and Depressive Disorder did not meet the respective Listing requirements.

With regards to his back impairments, Plaintiff asserts that the ALJ erred in

determining that he did not meet Listing 1.04(C)[10], stating the following:

> [] Plaintiff's medical evidence of record proves that he has degenerative disc disease with lumbar spinal stenosis with pseudoclaudication or pain and discomfort in his legs, feet and buttocks as a result of the narrowing of his spinal canal resulting in the inability to ambulate effectively.

(Doc. 11, p. 5).  Plaintiff also argues that not only did his back impairments meeting Listing 1.04(C), but also that the ALJ failed to provide an explanation as to why Plaintiff did not meet this Listing.

With regard to the latter assertion that the ALJ failed to provide, in the step three discussion section, an explanation as to why Plaintiff did not meet Listing 1.04, it is determined that Plaintiff's argument is unfounded because the ALJ discussed all relevant medical evidence in relation to Listing 1.04(C) in the RFC section of her opinion.  In Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119-120 (3d Cir. 2000), the United States Court of Appeals for the Third Circuit held that an administrate law judge is required to set forth the reasons for his/her decision, and that a bare conclusory statement that an impairment did not match, or is not equivalent to, a listed impairment is insufficient.  However, the Third Circuit Court of Appeals further explained the holding in Burnett:

---

10.  It is noted that Plaintiff has not asserted that his back impairments met Listing 1.04(A) or 1.04(B).  Therefore, the focus remains on whether he met all criteria for Listing 1.04(C) only.

Burnett does not require the ALJ to use particular language or
adhere to a particular format in conducting his analysis.
Rather, the function of Burnett is to ensure that there is
sufficient development of the record and explanation of finding
to permit meaningful review.  In this case, the ALJ's decision,
read as a whole, illustrates that the ALJ considered the
appropriate factors in reaching the conclusion that [the
plaintiff] did not meet the requirements for any listing,
including Listing 3.02(A).  The ALJ's opinion discusses the
evidence pertaining to chronic obstructive and restrictive lung
disease, specifically referencing 'pulmonary function studies . .
. consistent with moderately severe obstructive and restrictive
defects,' but pointing to the lack of pulmonary complications,
and a finding that claimant's lungs were clear.  Also, the ALJ
noted that claimant's medical history showed no frequent
hospitalization or emergency treatments.  Tr. At 13-14.  This
discussion satisfies Burnett's requirement that there be
sufficient explanation to provide meaningful review of the step
three determination.

Jones v. Barnhart, 364 F.3d, 501, 505; See Rivera v. Commissioner of Social

Security, 164 F.App'x 260, 263 (3d. Cir. 2006) (holding that an ALJ's failure to

explain a determination that a plaintiff does not meet a Listing is harmless error if

". . . in reviewing the voluminous medical evidence available to us, we found

abundant evidence supporting the position taken by the ALJ, and comparatively

little contradictory evidence" and thus does not warrant remand.).

In the case at hand, the ALJ sufficiently developed the record, and, in the

RFC discussion section, explained her finding that Plaintiff's back impairments

did not meet Listing 1.04(C) in a manner sufficient enough to permit meaningful

review of this conclusion.  (Tr. 23-30).  It is concluded that, in accordance with

Burnett, "the ALJ's decision, read as a whole, illustrates that the ALJ considered

the appropriate factors in reaching the conclusion that [the plaintiff] did not meet

the requirements for any listing, including Listing [1.04(C)]."  Therefore, we will

not disturb the ALJ's decision at step three based on this assertion.

Moreover, even if it were determined that the ALJ erred in not explaining at

step three why Plaintiff's back impairments did not meet Listing 1.04(C), it

remains that such an error was harmless due to the abundant evidence supporting

her position that Plaintiff did not meet all of the criteria in Listing 1.04(C) as

discussed by the ALJ throughout her decision.  (Tr. 23-30).  A claimant bears the

burden of showing that her impairment meets or equals a listed impairment, and

that she is thus presumptively disabled.  Burnett, 220 F.3d at 120 n.2 (citing

Williams v. Sullivan, 970 F.2d 1178, 1186 (3d Cir. 1992)).   A plaintiff must meet

all of the specified requirements of a Listing in order to be considered

presumptively disabled.  Sullivan v. Zebley, 493 U.S. 521, 532 (1990); 20 C.F.R.

§ 404.1525(a); 20 C.F.R. pt. 404, subpt. P, app. 1. "For a claimant to show his

impairment matches a listing, it must meet all of the specified medical criteria.  An

impairment that manifests only some of those criteria, no matter how severely,

does not qualify." Jones, 364 F.3d at 504 (citation omitted) (emphasis in original).

A claimant meets Listing 1.04(C) if he or she can prove the following:

> Disorders of the spine (e.g., herniated nucleus pulpous, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.  With:
>
> ........................................................................................................
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. pt 404, subpt. P, app. 1, § 1.04(C).  "Neurogenic claudication is synonymous with pseudoclaudication."  Holland v. Comm'r Soc. Sec. Admin., 2014 U.S. Dist. LEXIS 76164, at *2, n.2 (D. Md. June 3, 2014) (citing Thomas N. Byrne et al., *Diseases of the Spine and Spinal Cord* 148 (2000)); see also Naegele v. Barnhart, 433 F. Supp. 2d 319, 323 (W.D.N.Y. 2006) ("Pseudoclaudication, or neurogenic claudication, means intermittent limping caused by lumbar spinal stenosis") (citing *Stedman's Medical Dictionary* 360 (27th ed. 2000)).

In the case at hand, the ALJ repeatedly cites the medical records that support her finding that Plaintiff did not meet his burden of proving his back impairments met all the criteria for Listing 1.04(C).  The ALJ discusses that Plaintiff's physical examinations were largely unremarkable because he had intact muscle strength, a normal gait, negative straight leg raising tests, and intact

sensation.  (Tr. 23-30, 315, 328, 337, 360-61, 384-415, 418, 424-426, 681-88, 702).   Thus, the criteria of Listing 1.04(C) that Plaintiff's condition result in pseudoclaudication and an inability to ambulate effectively was not met. Furthermore, as noted by the ALJ, diagnostic studies do not mention a definite compromise of a nerve root or the spinal cord, but rather make reference to only a potential impingement of a nerve root.  However, several other United States District Courts have held, and this Court agrees, that "[a] conceivable possiblity of intermittent nerve root impingement does not establish a compromise of a nerve root."  Ragsdale v. Astrue, 2012 WL 5289635, at *7 (W.D. Mo. Oct. 23, 2012) (internal quotations omitted); accord Bogart v. Colvin, 2013 WL 5937041, at *2-3 (W.D. Ark. Nov. 6, 2013).  As such, the potential nerve root impingement criteria for Listing 1.04(C) has also not been met.

Accordingly, substantial evidence supports the ALJ's reasoning that Plaintiff was able to ambulate effectively with a normal gait and did not have a comprise of nerve roots or his spinal cord.  Thus, Plaintiff did meet his burden of proving his back impairments met all the criteria for Listing 1.04(C).  As such, the ALJ's decision at step three that Plaintiff's back impairments did not meet Listing 1.04(C) will not be disturbed on appeal.

## 2.   **Medical Opinion Evidence**

Plaintiff asserts that the ALJ erred in the weight she afforded to the treating and examining source opinions.  (Doc. 11, pp. 3, 6-7).  More specifically, Plaintiff argues that the ALJ erred in giving significant weight to part of Dr. Waldron's opinion, while ignoring the part that stated that Plaintiff's daily activities were significantly limited and that he continued to experience pain that significantly impacted his ability to perform work-related activities.  (Id. at 6-7).  Plaintiff also argues that the ALJ "completely discounted the Plaintiff's primary care physician, Hussain Abdul-Al, M.D."  (Id. at 7).

The preference for the treating physician's opinion has been recognized by the Third Circuit Court of Appeals and by all of the federal circuits.  See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000).  This is especially true when the treating physician's opinion "reflects expert judgment based on a continuing observation of the patient's condition over a prolonged time." Morales, 225 F.3d at 317; Plummer, 186 F.3d at 429; see also 20 CFR § 416.927(d)(2)(i)(1999) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").

However, when the treating physician's opinion conflicts with a non-

treating, non-examining physician's opinion, the ALJ may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." Morales, 225 F.3d 316-18.  It is within the ALJ's authority to determine which medical opinions he rejects and accepts, and the weight to be given to each opinion.  20 C.F.R. § 416.927.  The ALJ is permitted to give great weight to a medical expert's opinion if the assessment is well-supported by the medical evidence of record.  See Sassone v. Comm'r of Soc. Sec., 165 F. App'x 954, 961 (3d Cir. 2006) (holding that there was substantial evidence to support the ALJ's RFC determination that the plaintiff could perform light work, even though this determination was based largely on the opinion of one medical expert, because the medical expert's opinion was supported by the medical evidence of record); Baker v. Astrue, 2008 U.S. Dist. LEXIS 62258 (E.D. Pa. Aug. 13, 2008).

Regardless, the ALJ has the duty to adequately explain the evidence that he rejects or to which he affords lesser weight.  Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 505-06 (3d Cir. 2009) (holding that because the ALJ did not provide an adequate explanation for the weight he gave to several medical opinions, remand was warranted).  "The ALJ's explanation must be sufficient enough to permit the court to conduct a meaningful review." In re Moore v. Comm'r of Soc. Sec., 2012 U.S. Dist. LEXIS 100625, *5-8 (D.N.J. July 19, 2012) (citing Burnett v. Comm'r

of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000)).

Regarding the medical opinion evidence, the ALJ stated the following:

> As for the opinion evidence, the September 2009 form
> completed by Dr. [Abdul-Al] is given little weight as it
> contains no explanation in terms of signs or laboratory findings
> to support [his] opinion or conclusions.
>
> Some weight is given to Dr. Sen's assessment, particularly to
> the extent that it supports a finding that [Plaintiff] is capable of
> lifting/ carrying the weights necessary to perform light work.
> However, no weight is given to Dr. Sen's assessment of
> [Plaintiff's] limitations with regard to sitting, standing, walking
> and pushing and pulling.  These limitations are not explained in
> terms of signs or laboratory findings and are not supported by
> Dr. Sen's own findings nor the record as a whole.
>
> Dr. Waldron's opinion is consistent with the record as a whole
> and is given great weight.

(Tr. 27-28).

Initially, it is determined that the ALJ did not "completely discount" the

opinion rendered by Dr. Hussain Abdul-Al, Plaintiff's treating physician.  Rather,

the ALJ gave this opinion little weight because it was not supported or explained

by signs or laboratory findings.  (Tr. 27).  On September 8, 2009, Dr. Hussain

Abdul-Al filled out a Clinical Assessment of Pain form, and opined the following:

(1) Plaintiff's pain was present to such an extent as to be distracting to adequate

performance of daily activities and/ or work; (2) Plaintiff experienced greatly

increased pain in relation to physical activities such as walking, standing, bending, stooping, and moving of extremities to such a degree as to cause distraction from or total abandonment of a task; (3) Plaintiff's medications could be expected to cause some mildly troublesome side effects; (4) Plaintiff's pain and/ or prescribed medication would present some limitations on his ability to perform his previous work, but not to such a degree as to create serious problems in most instances; (5) Plaintiff's pain would remain a significant element in his life, although it may lessen in intensity or frequency in the future; and (6) treatments for his pain had no appreciable effect or have only briefly altered the level of pain. (Tr. 346-348). In reviewing the medical record, it is determined that substantial evidence supports the ALJ's decision to give little weight to Dr. Hussain Abdul-Al because this opinion was unsupported by an explanation, signs, or laboratory findings to support it. See 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) (stating that "the more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion."). Plaintiff rarely complained of back pain to Dr. Abdul-Al during the seven (7) visits he made to this physician in 2010 and 2011, and Dr. Abdul-Al's examinations of Plaintiff routinely revealed normal and intact muscle

strength, intact sensation, a normal gait, a lack of muscle atrophy, and negative straight leg-raising tests.  (Tr. 22-30, 314, 328, 337, 360-361, 384-425, 681-688, 702).  Moreover, Dr. Abdul-Al's opinion rendered on September 8, 2009, that Plaintiff's pain was disabling, contained an internal inconsistency as Dr. Abdul-Al also opined that Plaintiff's pain would create some limitation but "not to such a degree as to create serious problems" with Plaintiff's ability to perform previous work.  (Tr. 347).  As such, it is determined that because Dr. Abdul-Al's opinion was not supported by an explanation, medical signs, or laboratory findings, the ALJ did not err in assigning this opinion little weight.

Regarding the great weight he assigned to part of Dr. Waldron's opinion, it is determined that the ALJ was correct in his analysis because this part of Dr. Waldron's opinion was consistent with the overall record.  Dr. Waldron opined that Plaintiff could: occasionally lift and/ or carry twenty (20) pounds; frequently lift and/ or carry ten (10) pounds; stand and/or walk for four (4) hours in an eight (8) hour workday; sit for about six (6) hours in an eight (8) hour workday; engage in unlimited pushing and pulling within the aforementioned weight limitations; occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; and occasionally balance, stoop, kneel, crouch, and crawl.  (Tr. 422-423).  Dr. Waldron further opined that there were no manipulative limitations established,

including reaching, handling, fingering, and feeling.  (Tr. 423).  In terms of

environmental limitations, Plaintiff was to avoid concentrated exposure to cold,

wetness, and vibration, but was unlimited in exposure to heat, humidity, noise,

fumes, odors, gases, dusts, poor ventilation, and hazards.  (Tr. 424).  Plaintiff

argues that the ALJ erred in giving significant weight to this aforementioned part

of Dr. Waldron's opinion and in failing to discuss in the part of the opinion that

states the following:

> [Plaintiff] has described daily activities that are significantly
> limited.  This is consistent with the limitations indicated by
> other evidence in this case.  The medical evidence shows that
> despite ongoing treatment, he continues to have pain which
> significantly impacts on his ability to perform work related
> activities.  Furthermore, he has pursued appropriate follow-up
> care for his impairments.  He received treatment from a
> specialist for his impairments.

(Tr. 426).  However, notwithstanding these narrative comments, Dr. Waldron

ultimately concluded that Plaintiff retained the ability to work within the

aforementioned limitations because, as was discussed by Dr. Waldron, Plaintiff

"[had] [n]o edema.  Motor was 5/5 for all except for LLE (4/5).  Grip 100%

bilaterally. [Plaintiff] was using a cane (per his own discretion)."  (Tr. 426).

Furthermore, it has been established that an administrative law judge has the

authority to give weight to part of an opinion so as long as the record supports the

evaluation.  See Jones v. Barnhart, 2005 U.S. Dist. LEXIS 17621, *18-19 (E.D.

Pa. 2005).  In the case at hand, the record supports the ALJ's decision to give great

weight to Dr. Waldron's opinion because: (1) Plaintiff's physical examinations

were largely unremarkable because he had intact muscle strength, a normal gait,

negative straight leg raising tests, and intact sensation; and (2) Plaintiff was able

to care for his five and a half (5 ½) year old son independently, drive a car, prepare

simple meals, do the laundry, perform several household chores, leave his house

about five (5) days a week unaccompanied, shop for groceries, camp, fish, attend

Alcoholics Anonymous meeting several times per week, "get as much exercise as

[he] could," see his son and his son's mother daily, and work as a security guard at

an amusement park for three (3) months during the period for which he was

alleging disability.  (Tr. 23-30, 48-49, 53, 197, 266-270, 315, 328, 337, 360-61,

384-415, 418, 424-426, 681-88, 702).  In reviewing the great weight the ALJ

assigned to Dr. Waldron's opinion, and his explanation that this opinion was

consistent with the overall record, it is determined that substantial evidence

supports the ALJ's decision to give great weight to the opinion of Dr. Waldron,

and this determination will not be disturbed on appeal.

### 3. Credibility Determination

Plaintiff asserts that the ALJ erred in determining Plaintiff's credibility and

did not properly evaluate Plaintiff's subjective complaints in accordance with 20

C.F.R. 416.929 and Social Security Rule 96-7(p).  (Doc. 11, pp. 3-4, 7-8).   More

specifically, Plaintiff argues the following:

> [Plaintiff] was a credible witness clearly describing his pain
> and its limitations as well as his memory and mental
> challenges. [Plaintiff] testified that he has trouble walking; his
> personal care and household chores is hard for him in that
> anything from the waist down is nearly impossible; he gets
> very easily confused and suffers from problems with short-term
> memory; he feels as though he is experiencing auditory
> hallucinations; and, sleeping is an issue.  He lives in a
> handicapped apartment because it is difficult for him to use
> stairs.  His pain is aggravated by too much walking, lifting
> anything, standing too long, driving too far, or any rigidly held
> posture.
>
> Plaintiff has also been diagnosed with bipolar affective
> disorder type II and depressive disorder by psychiatrist Andrew
> Newton, M.D.  And, he treats with a counselor for his mental
> health concerns, lapses in memory and inability to complete
> tasks.
>
> Plaintiff testified that he takes Hydroxyzine for panic attacks,
> Vicadin for pain, Gabapentin for neuropathy, Fentanyl patches
> for pain, Risperdone and Celexa for bipolar disorder and
> Flexeril for back spasms.  He suffers the following side effects
> from the medication: lack of sexual desire, dry mouth,
> headaches, and shooting pain in legs.

(Doc. 11, pp. 7-8).  Plaintiff additionally argues that the ALJ erred in finding that

Plaintiff's medical examinations were stable and benign when "in fact his

examinations have proven a worsening of his conditions."  (Doc. 11, p. 6).

As part of step four of the sequential evaluation process, once an ALJ concludes that there is a medical impairment that could reasonably cause the alleged symptoms, "he or she must evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to work." Hartranft, 181 F.3d at 362 (citing 20 C.F.R. § 404.1529(c)). This "requires the ALJ to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it." Id. In evaluating the intensity and persistence of a claimant's symptoms, an ALJ should consider (1) the claimant's history; (2) medical signs and laboratory findings; (3) medical opinions; and (4) statements from the claimant, treating and non-treating sources, and other persons about how the claimant's symptoms affect him/her. See 20 C.F.R. § 404.1529. Importantly, "[a]n individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." 1996 SSR LEXIS 4 (1996); 20 C.F.R. § 404.1529(c)(2).

"Generally, 'an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.'" Fell v. Astrue,

2013 U.S. Dist. LEXIS 167100, *29 (M.D. Pa. 2013) (Conaboy, J.) (quoting

Walters v. Commissioner of Social Sec., 127 F.3d 525, 531 (6th Cir. 1997));

Frazier v. Apfel, 2000 WL 288246 (E.D. Pa. 2000).  Social Security Ruling 96-7p

gives the following instructions in evaluating the credibility of the claimant's

statements:

> In general, the extent to which an individual's statements about
> symptoms can be relied upon as probative evidence in
> determining whether the individual is disabled depends on the
> credibility of the statements.  In basic terms, the credibility of
> an individual's statements about pain or other symptoms and
> their functional effects is the degree to which the statements
> can be believed and accepted as true.  When evaluating the
> credibility of an individual's statements, the adjudicator must
> consider the entire case record and give specific reasons for the
> weight given to the individual's statements.

SSR 96-7p.  "In particular, an ALJ should consider the following factors: (1) the

plaintiff's daily activities; (2) the duration, frequency and intensity of the

plaintiff's symptoms; (3) precipitating and aggravating factors; (4) the type,

dosage, effectiveness, and side effects of any medication taken to alleviate the

symptoms; (5) treatment, other than medication for relief of the symptoms; (6) any

measures the plaintiff uses or has used to relieve the symptoms; (7) the plaintiff's

prior work record; and (8) the plaintiff's demeanor during the hearing."  Jury v.

Colvin, 2014 U.S. Dist. LEXIS 33067, *33 (M.D. Pa. 2014) (Conner, J.) (citing 20

C.F.R. §§ 404.1529(c)(3), 416.929).

In assessing Plaintiff's credibility in this case, the ALJ stated the following:

> In terms of [Plaintiff's] credibility, he presented somewhat
> dramatically and his testimony answers on forms that he
> completed in conjunction with his disability application had a
> sarcastic tone.  He did not present as being entirely candid and
> forthcoming.  Rather, his dramatic presentation, including the
> "need" to kneel on the floor, lean on the wall, and make
> numerous changes of position during the hearing, seemed to be
> a way for him to overstate the severity of his symptoms and
> limitations. [Plaintiff] began the hearing by reporting that he
> may need to squat on the floor during the hearing.  Overall, his
> demeanor and appearance was unpersuasive.  It is emphasized
> that this observation is only one among many being relied on in
> reaching a conclusion regarding the credibility of [Plaintiff's]
> allegations and [his] [RFC].

> [Plaintiff] presented with a walking stick, which he says he
> needs to carry with him everywhere.  He alleged that he has
> balance problems and uses the stick like a "third leg."  The
> medical evidence does not support his allegations that he has
> problems with balance and no doctor has prescribed or
> recommended the use of a walking stick for [Plaintiff's]
> ambulation.  While Dr. Sen notes the cane in his opinion, he
> did not set forth any signs or laboratory findings to support the
> need for one by [Plaintiff].  Gait findings throughout the
> records are generally normal with March 2012 notes from
> Geisinger noting that [Plaintiff] has a little swagger due to the
> left leg being shorter than the right.  There is no longitudinal
> record of [Plaintiff] being prescribed or actually requiring any
> assistive device to ambulate.  Again, this seems to be a means
> for [Plaintiff] to draw attention to and exaggerate the severity
> of his symptoms and limitations.

> Regarding his mental impairments, [Plaintiff] has alleged that

he has been hallucinating cats for eight or ten years, and that he has auditory hallucinations. Not until recently does his mental health treatment records make any mention of this, and it is only addressed in passing. One would expect [Plaintiff] would have addressed a nearly decade-long history or recurring visual hallucinations and current auditory hallucinations with his physicians or mental health treatment providers on a more consistent basis. To the contrary, the mental health records reflect no evidence of psychosis and do not show a level of impaired thinking and mental functioning that [Plaintiff] has alleged.

[Plaintiff] takes medications for his conditions and has not reported any significant or debilitating side effects. He alleges that none of his medications are very effective, and says that he does not trust the "medical establishment," yet he continues to take his medications. Again, in a dramatic fashion, [Plaintiff] testified that without his medications, which he says are not ver effective, that he would kill himself.

Overall, [Plaintiff's] reported level of pain and other symptoms, along with the alleged severity [of] his self-reported limitations, are not supported by the medical evidence of record. Medical examinations have been quite benign and stable. His treatment for his alleged impairments since his alleged onset date has been entirely routine and conservative.

(Tr. 28-29).

Upon examination of the ALJ's credibility analysis, it is determined that the

ALJ complied with SSR 96-7p in arriving at Plaintiff's credibility determination

with respect to his statements regarding the severity of his symptoms because she

explained that these statements were not supported by the objective medical

evidence, including Plaintiff's overall favorable response to psychiatric and pain medications, the objective examinations findings and opinions of the aforementioned physicians, and Plaintiff's own limited mental health treatment history and his overall conservative treatment history.

Furthermore, the ALJ also considered the aforementioned factors listed in 416.929 in arriving at Plaintiff's credibility determination.  First, the ALJ correctly noted that Plaintiff's activities of daily living discredited his account of the severity of his symptoms.  (Tr. 20-21).  Plaintiff testified he was able to care for his five and a half (5 ½) year old son independently, drive a car, prepare simple meals, do the laundry, perform several household chores, leave his house about five (5) days a week unaccompanied, shop for groceries, camp, fish, attend Alcoholics Anonymous meeting several times per week, "get as much exercise as [he] could," see his son and his son's mother daily, and work as a security guard at an amusement park for three (3) months during the period for which he was alleging disability.[11]  (Tr. 48-49, 53, 197, 266-270, 396, 402, 404, 406).  In terms of concentration, Plaintiff was able to pay bills, count change, handle a savings account, use a checkbook, and use a computer.  (Tr. 48-49, 197, 269).  The ALJ

---

11. See 20 C.F.R §§ 404.1571, 416.971 (stating that any work performed by a claimant during the alleged disability period, even if not a substantial gainful activity, may show that the claimant was not disabled).

also took into account the fact that the record was devoid of evidence that the medications he took caused side effects; in fact, the medical records and Plaintiff's own testimony that he would "kill himself" were it not for the psychiatric medicines he was taking shows that Plaintiff's medications were effective. (Tr. 29). Third, the ALJ took into account treatment other than medications that Plaintiff used to relieve his symptoms, such as injections, which Plaintiff testified helped with his pain, and a cane, which was not prescribed by any physician. (Tr. 28). Lastly, the ALJ most certainly took into account Plaintiff's demeanor during the hearing, which was described by the ALJ as dramatic. (Tr. 28, 42, 60). Therefore, the ALJ determined Plaintiff's credibility in accordance with the non-exhaustive list of factors noted in 416.929, and correctly found that Plaintiff's subjective complaints were inconsistent with and unsupported by the record as a whole. (Tr. 22-30).

Furthermore, with regards to Plaintiff's argument that the ALJ erred in finding that Plaintiff's examinations were "quite benign and stable," which, in part, aided the ALJ in determining Plaintiff's credibility, this assertion is misguided. The ALJ was making this statement in reference to the severity of Plaintiff's symptoms, not in reference to the diagnostic findings or the severity of the impairments, in order to determine Plaintiff's credibility, and the medical

64

records, which were discussed by the ALJ at length, support this statement.  (Tr.

22-30).  Plaintiff had a normal gait, normal and intact sensations, negative straight

leg raising tests, a positive response to pain and psychiatric medications, normal

and intact muscle strength in all extremities, and a full range of motion in his neck.

(Tr. 23-30, 315, 328, 337, 360-61, 384-415, 418, 424-426, 681-88, 702).

Accordingly, it is determined that substantial evidence supports the ALJ's

credibility determination, and it will not be disturbed on appeal.

### 4.   **Vocational Expert Hypothetical**

Plaintiff argues that the ALJ erred in finding that he could no longer

perform his past relevant work as a stock broker, business consultant, or

manufacturing engineer, but could perform light work such as that performed by a

general office clerk, a receptionist, and a cashier.  (Doc. 11, p. 8).

A hypothetical question posed by the administrative law judge to the

vocational expert must include all of a claimant's functional limitations which are

supported by the record.  Ramirez v. Barnhart, 372 F.3d 546, 553-55 (3d Cir.

2004); Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987); Podedworny v.

Harris, 745 F.2d 210, 218 (3d Cir. 1984).  A hypothetical that omits limitations is

defective, and the answer thereto cannot constitute substantial evidence to support

denial of a claim.  Id.  However, "[w]e do not require an ALJ to submit to the

vocational expert every impairment <u>alleged</u> by a claimant." <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 554 (3d Cir. 2005) (emphasis in original).  When an ALJ's hypothetical question to a vocational expert sets forth the Plaintiff's limitations, as supported by the record, the vocational expert's response may be accepted as substantial evidence in support of the ALJ's determination that the Plaintiff is not disabled.  <u>See</u> <u>Chrupcala</u>, 829 F.2d at 1276.

At the administrative hearing, in the first hypothetical the ALJ posed to the VE, the ALJ asked the VE to assume that Plaintiff retained the RFC to perform light work with the following limitations: a left upper extremity push/ pull limitation; occasional climbing, balancing, and stooping; total avoidance of ladders; avoidance of extreme temperatures, humidity, vibration, and hazards; and the performance of only simple, routine tasks with low stress and no decision making.  (Tr. 64).  The VE responded that while an individual with these limitations could not perform any of the past work Plaintiff had performed, it would be possible for a person with these limitations to work as an office clerk, receptionist, or a cashier.  (Tr. 64).  When presenting his second hypothetical, the ALJ used this hypothetical and added more limitations, including a maximum standing limitation of two (2) hours, a weight restriction of twenty (20) pounds for occasionally lifting and carrying, a weight restriction of ten (10) pounds for

frequently lifting and/or carrying, and a sit or stand at will limitation.  (Tr. 65).

The VE responded that an individual with these limitations from this second

hypothetical could perform the same jobs as discussed in response to the first

hypothetical, including the jobs of a receptionist or interview clerk.  (Tr. 65).  In

presenting the third hypothetical, the ALJ then further limited the prior two (2)

hypotheticals to include only sedentary work and a weight restriction of ten (10)

pounds for occasionally lifting and/ or carrying.  (Tr. 66).  The VE responded that

an individual with these limitations would still be able to perform the same

original jobs as in the prior hypotheticals, including an office clerk, receptionist,

or a cashier.  (Tr. 66).  In the fourth and last hypothetical, the ALJ added more

limitations, including that the claimant would require breaks in excess of one (1)

or two (2) per day that were unscheduled and varied, absences in excess of three

(3) times per month, and being off task thirty (30) percent of the day.  (Tr. 66-67).

The VE responded that such an individual could not perform any past relevant or

any other jobs in the regional or national economy.  (Tr. 67).

Plaintiff asserts that the ALJ should have instead rendered a decision in

accordance with the VE's response to the last hypothetical because it was more in

line with Plaintiff's testimony and the medical evidence.  (Doc. 11, pp. 8-9).

However, as discussed, the ALJ's RFC determination is supported by substantial

evidence because it is supported by the record, including Plaintiff's testimony as to what she could do.  The functional limitations included in the RFC were all included in the hypothetical posed to the VE.  (Tr. 22).  Furthermore, the limitations included in the last hypothetical the ALJ presented to the VE were not supported by the record, and thus the ALJ was not obligated to accept the VE's testimony in that regard.  See Rutherford v. Barnhart, 399 F.3d 56, 57-58 (3d Cir. 1987) (holding that an ALJ is not obligated to credit a vocational expert's testimony in response to a hypothetical question that was based on Plaintiff's subjective complaints).  Therefore, the ALJ's hypothetical to the VE is supported by substantial evidence because it included all of Plaintiff's functional limitations that were supported by the record, and this determination will not be disturbed on appeal.

## CONCLUSION

Based upon a thorough review of the evidence of record, it is determined that the Commissioner's decision is supported by substantial evidence.  Therefore, pursuant to 42 U.S.C. § 405(g), the appeal will be denied and the decision of the Commissioner will be affirmed.

A separate Order will be issued.

**Date**: July 16, 2015

/s/ **William J. Nealon**
**United States District Judge**